## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. <u>24-CR-20155-RUIZ/TORRES(s)</u>

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)
18 U.S.C. § 1956(h)
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1), (a)(7)

FILED BY_____*MP*____D.C.

*Jun 20, 2024*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

vs.

**ENRIQUE PEREZ-PARIS,
DIEGO SANUDO SANCHEZ CHOCRON,
GREGORY CHARLES MILO CASKEY,
OMAR PALACIOS, and
NADIR PEREZ,**

Defendants.
_____/

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Superseding Indictment:

### COVID-19 Outbreak and Testing

1.      In or around December 2019, severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the virus that causes coronavirus disease ("COVID-19"), began to spread throughout the world.

2.      On January 31, 2020, the Secretary of the U.S. Department of Health and Human Services ("HHS") declared that, in light of the confirmed cases of COVID-19, a public health

emergency existed nationwide.

3.      In Proclamation 9994 of March 13, 2020, the United States President declared the ongoing COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia.

4.      Individuals sought COVID-19 testing for a variety of reasons, including for diagnosis when suffering from COVID-19 symptoms, and in advance of engaging in certain activities, like airplane travel and planned contact with others who, due to age or health conditions, were at higher risk of death or severe illness from COVID-19.  Individuals often needed their test results within a short period of time before engaging in such activities.

5.      On or around April 10, 2023, the United States President signed a joint resolution from the U.S. Congress to terminate the national emergency declared in Proclamation 9994 of March 13, 2020.

<u>United States Food & Drug Administration ("FDA")</u>
<u>Emergency-Use Authorization</u>

6.      Emergency-Use Authorization ("EUA") authority allowed the FDA to help strengthen the nation's public health protections against chemical, biological, radiological, and nuclear ("CBRN") threats including infectious diseases, by facilitating the availability and use of medical countermeasures needed during public health emergencies.

7.      Under Section 564 of the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), Title 21, United States Code, Section 360bbb–3, when the Secretary of HHS declared that an EUA is appropriate, the FDA was permitted to authorize unapproved medical products or unapproved uses of approved medical products to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by CBRN threat agents when certain criteria were met, including when there were no adequate, approved, and available alternatives.

2

8.     On February 4, 2020, the Secretary of HHS determined that there was a public health emergency that had a significant potential to affect national security or the health and security of United States citizens living abroad and that involved COVID-19.  Based on that determination, the Secretary of HHS also declared that circumstances existed justifying the authorization of emergency use of *in vitro* diagnostics for detection and/or diagnosis of COVID-19, subject to the terms of any authorization issued pursuant to the FD&C Act.

9.     Throughout the pandemic, various *in vitro* tests to detect COVID-19 were developed.  This included COVID-19 polymerase chain reaction ("PCR") tests and COVID-19 antigen tests (collectively, "COVID-19 testing").  COVID-19 PCR tests were a type of nucleic acid amplification test, which were more likely to detect the virus than antigen tests.  COVID-19 PCR samples were usually taken by a health care provider and transported to a laboratory for testing.  It could take up to 3 days to receive COVID-19 PCR results.  COVID-19 antigen tests were rapid tests that usually produced results in 15-30 minutes.

### Genetic Testing

10.    Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future.  For example, cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.  Pharmacogenetic ("PGx") testing used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications.  Cardiovascular genetic testing (referred to herein as "cardio testing" or "cardio tests") used DNA sequencing to detect mutations in genes that can indicate an increased risk of developing serious cardiovascular conditions in the

3

future. CGx, PGx, and cardio genetic testing are referred to herein collectively as "genetic tests" or "genetic testing."

### Medicare Program

11.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. HHS, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.   Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

12.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).

13.     Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

14.     Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

15.     A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").   The claim form could be submitted in hard copy or electronically via interstate wire.   When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

16.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.   Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### Medicare Part B Enrollment

17.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.   The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.   The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

18.     Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Arkansas, Colorado, New Mexico, Oklahoma, Texas, Louisiana, and

5

Mississippi.

19.    To receive Medicare reimbursement, providers had to make appropriate applications to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

20.    CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

21.    Payments under Medicare Part B were often made directly to the health care provider rather than to the beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**Medicare Part B Coverage for Diagnostic Laboratory Tests**

22.    Medicare did not cover diagnostic testing, including COVID-19 testing and genetic testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."

6

23.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 U.S.C. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

24.     Additionally, "[d]uring the Public Health Emergency for COVID–19, . . . the order of a physician or other applicable practitioner is not required for one otherwise covered diagnostic laboratory test for COVID–19 . . . . Subsequent otherwise covered COVID–19 and related tests described in the previous sentence are reasonable and necessary when ordered by a physician or nonphysician practitioner in accordance with this paragraph (a) . . . ." 42 U.S.C. § 410.32(a)(3). Medicare did not cover COVID-19 tests that were not FDA-authorized.

### Shell Lab Rule

25.     Title 42, United States Code, Section 13951(h)(5) provided that payment from Medicare for covered clinical diagnostic laboratory tests may only be made to "the person or entity which performed or supervised the performance of such test." If a test was "performed at the request of a laboratory by another laboratory," the referring laboratory could only be paid by Medicare for that test if "not more than 30 percent of the clinical diagnostic laboratory tests for which such referring laboratory . . . receives requests for testing during the year in which the test is performed, are performed by another laboratory." *Id.* This was commonly called the "Shell Lab

Rule," as it, in essence, precluded pass-through billing arrangements where a laboratory bills Medicare for more than 30 percent of the tests that were actually performed by another laboratory.

### The HRSA Uninsured Program

26.     The Families First Coronavirus Response Act ("FFCRA") was a federal law enacted on or about March 14, 2020, as part of the federal government's initial response to the then-emerging COVID-19 pandemic.

27.     The FFCRA, among other things, appropriated funds to reimburse the cost of providing diagnostic testing and services for COVID-19 in individuals without health insurance. These funds, and additional funds appropriated through subsequent legislation for testing, treatment, and vaccines for uninsured individuals, were distributed through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program ("HRSA COVID-19 Uninsured Program").

28.     The HRSA COVID-19 Uninsured Program was administered by HHS through its agency, the Health Resources and Services Administration ("HRSA").  HRSA contracted with UnitedHealth Group, a private insurance company, to handle claims administration and payments, which UnitedHealth Group performed through its unit Optum Health.  Reimbursements by HRSA were provided on a rolling basis directly to eligible providers, including laboratories.  The HRSA COVID-19 Uninsured Program was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f).

29.     To receive reimbursement under the HRSA COVID-19 Uninsured Program, a provider was required to attest to compliance with the Terms and Conditions of the program.  The terms and conditions required the provider to submit truthful claims, with respect to uninsured

individuals, for: (1) COVID-19 testing, which was defined as a test for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19, and/or testing-related items and services such as an office visit or a telehealth visit that resulted in the administration of a COVID-19 test; (2) care or treatment related to positive diagnoses of COVID-19, where COVID-19 was the primary reason for treatment; or (3) administering a COVID-19 vaccination. Services not covered by traditional Medicare were also not covered under the HRSA COVID-19 Uninsured Program.

30.     Providers seeking reimbursement under the HRSA COVID-19 Uninsured Program were required to enroll as a provider participant, check to ensure that patients were uninsured, submit claims and patient information electronically, and receive payment through direct deposit. Reimbursements were generally made at Medicare rates.

31.     Claims submitted electronically to the HRSA COVID-19 Uninsured Program and payments made from the HRSA COVID-19 Uninsured Program were transmitted through interstate wires.

### The Defendants, Related Entities and Relevant Persons

32.     Innovative Genomics LLC ("IGX"), a limited liability company formed under the laws of Texas, was a laboratory that purportedly provided COVID-19 PCR and other forms of laboratory testing.

33.     Defendant **ENRIQUE PEREZ-PARIS**, a resident of Miami-Dade County, Florida, was an owner, manager, and operator of IGX. **PEREZ-PARIS** was a signatory on IGX's bank accounts ending in 7455 at Bank 1 ("IGX Account 1") and 7653 at Bank 2 ("IGX Account 2").

34.     Defendant **DIEGO SANUDO SANCHEZ CHOCRON**, a resident of Los Angeles County, California, was an owner, manager, and operator of IGX.  **SANCHEZ** was a signatory on IGX Account 1 and IGX Account 2.

35.     NMI I LLC ("NMI I"), a limited liability company formed under the laws of Texas, was purportedly a management services organization.

36.     Defendant **GREGORY CHARLES MILO CASKEY**, a resident of Bexar County, Texas, was an owner, manager, and operator of IGX and NMI I.  **CASKEY** was a signatory on IGX Account 1, IGX Account 2, and NMI I's bank account ending in 9078 at Bank 3 (the "NMI I Account").

37.     Tree Medical Solutions LLC ("Tree Medical") was a company formed under the laws of Florida, with its principal place of business in Miami-Dade County, Florida.

38.     Defendant **OMAR PALACIOS**, a resident of Miami-Dade County, Florida, was an owner, manager, and operator of Tree Medical.  **PALACIOS** was a signatory on Tree Medical's bank account ending in 8011 at Bank 4 (the "Tree Medical Account").

39.     Ven-Vamos Strategies LLC ("Ven-Vamos") was a company formed under the laws of Florida, with its principal place of business in Miami-Dade County, Florida.

40.     Defendant **NADIR PEREZ**, a resident of Miami-Dade County, Florida, was an owner, manager, and operator of Ven-Vamos.  **PEREZ** was a signatory on Ven-Vamos' bank account ending in 9751 at Bank 4 (the "Ven-Vamos Account").

41.     Nikita Hermesman, a current resident of Bexar County, Texas, and former resident of Miami-Dade County, Florida, was an owner, manager, and operator of IGX.  Hermesman was a signatory on IGX Account 1.

42.     Co-Conspirator 1, a resident of Bexar County, Texas, was a physician practicing general and family medicine.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

1.     The General Allegations section of this Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around November 2019, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON,**
**GREGORY CHARLES MILO CASKEY,**
**OMAR PALACIOS, and**
**NADIR PEREZ,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, Nikita Hermesman, Co-Conspirator 1, and others known and unknown to the Grand Jury:

a.     to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including Medicare and the HRSA COVID-19 Uninsured Program, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.     to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and

11

fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of COVID-19 and genetic testing by IGX, from the Southern District of Florida, and elsewhere, so that IGX could bill health care benefit programs for COVID-19 and genetic testing, without regard to whether the beneficiaries needed the tests or whether the tests were eligible for reimbursement; (b) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to health care benefit programs for COVID-19 and genetic testing that were medically unnecessary and ineligible for reimbursement; (c) concealing the submission of false and fraudulent claims to health care benefit programs; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.      **ENRIQUE PEREZ-PARIS** and **DIEGO SANUDO SANCHEZ CHOCRON** enrolled IGX as a provider with Medicare, the HRSA COVID-19 Uninsured Program, and other health care benefit programs to receive reimbursements for diagnostic testing, including COVID-

19 and genetic testing.  In these enrollment documents, **PEREZ-PARIS** and **SANCHEZ** listed themselves, **GREGORY CHARLES MILO CASKEY**, and Nikita Hermesman as IGX's owners.

5.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON,** **GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators agreed to pay kickbacks and bribes to physicians, including to Co-Conspirator 1 through NMI I, for ordering and arranging the ordering of medically unnecessary and non-reimbursable genetic testing that IGX billed to Medicare.

6.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON,** **GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators agreed to pay kickbacks and bribes to patient recruiters in exchange for referring Medicare beneficiaries to IGX for the furnishing and arranging for the furnishing of genetic testing that IGX billed to Medicare.

7.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON,** **GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators caused IGX to bill Medicare in violation of the Shell Lab Rule.

8.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON,** **GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators agreed to pay kickbacks and bribes to patient recruiters, including **OMAR PALACIOS**, through Tree Medical, and **NADIR PEREZ**, through Ven-Vamos, for referring individuals to IGX for the furnishing and arranging for the furnishing of COVID-19 testing that IGX billed to Medicare and the HRSA COVID-19 Uninsured Program.

9.     **OMAR PALACIOS**, through Tree Medical, entered into a contract with IGX in which IGX agreed to pay **PALACIOS** illegal kickbacks and bribes of approximately $15 for each

COVID-19 antigen test and approximately $35 for each COVID-19 PCR test that **PALACIOS** referred to IGX.

10.     **NADIR PEREZ,** through Ven Vamos, entered into a contract with IGX where IGX agreed to pay illegal kickback and bribes of approximately $10 for each COVID-19 antigen test and approximately $30 for each COVID-19 PCR test that **PEREZ** referred to IGX.

11.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ,** Nikita Hermesman, and other co-conspirators recruited and used health care providers, including physicians, to order repeated COVID-19 PCR tests for beneficiaries, even though the health care providers had no prior relationship with the beneficiaries, were not treating and consulting the beneficiaries for COVID-19 or symptoms of COVID-19, sometimes were ineligible to order the tests altogether, and did not use the test results to treat the beneficiaries.

12.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ,** Nikita Hermesman, and other co-conspirators, through IGX, billed, and caused to be billed, to Medicare, the HRSA COVID-19 Uninsured Program, and other health care benefit programs, claims for reimbursement for COVID-19 testing but the tests, if performed at all, did not have FDA emergency-use authorization and were not reimbursable.

13.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ,** Nikita Hermesman, and other co-conspirators, through IGX, billed, and caused to be billed, to Medicare, the HRSA COVID-19 Uninsured Program, and other health care benefit programs, COVID-19 testing that was medically unnecessary, never provided, and ineligible for reimbursement.

14.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ,** Nikita Hermesman, and other co-conspirators, through IGX, billed, and caused to be billed, to the HRSA COVID-19 Uninsured Program, COVID-19 testing for Medicare beneficiaries despite the HRSA COVID-19 Uninsured Program being reserved for individuals who were uninsured.

15.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ,** Nikita Hermesman, Co-Conspirator-1, and other co-conspirators caused IGX to submit false and fraudulent claims to health care benefit programs, including Medicare and the HRSA COVID-19 Uninsured Program, via interstate wire communications, in at least the approximate amount of $65,875,979 for COVID-19 and genetic testing.

16.     As the result of these false and fraudulent claims, health care benefit programs, including Medicare and the HRSA COVID-19 Uninsured Program, made payments to IGX via interstate wire transfers in at least the approximate amount of $44,417,197.

17.     **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ,** Nikita Hermesman, Co-Conspirator 1, and other co-conspirators used the proceeds of the fraud to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-7
### Health Care Fraud
### (18 U.S.C. § 1347)

1.      Paragraphs 1-25 and 32-42 of the General Allegations section of this Superseding

Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around November 2019, and continuing through in or around June 2023,

in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON,**
**GREGORY CHARLES MILO CASKEY,**
**OMAR PALACIOS, and**
**NADIR PEREZ,**

in connection with the delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health

care benefit program affecting commerce, as defined in Title 18, United States Code, Section

24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses,

representations, and promises, money and property owned by, and under the custody and control

of, said health care benefit program.

### Purpose of the Scheme and Artifice

3.      The Purpose of the Conspiracy section of Count 1 of this Superseding Indictment

is re-alleged and incorporated by reference as though fully set forth herein as a description of the

purpose of the scheme and artifice.

### The Scheme and Artifice

The manner and means by which the defendants and their accomplices executed and

attempted to execute the scheme and artifice included, among other things:

16

4.      **ENRIQUE PEREZ-PARIS** and **DIEGO SANUDO SANCHEZ CHOCRON** enrolled IGX as a provider with Medicare to receive reimbursements for diagnostic testing, including COVID-19 and genetic testing. In these enrollment documents, **PEREZ-PARIS** and **SANCHEZ** listed themselves, **GREGORY CHARLES MILO CASKEY**, and Nikita Hermesman as IGX's owners.

5.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and their accomplices agreed to pay kickbacks and bribes to physicians, including to Co-Conspirator 1 through NMI I, for ordering and arranging the ordering of medically unnecessary and non-reimbursable genetic that IGX billed to Medicare.

6.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and their accomplices agreed to pay kickbacks and bribes to patient recruiters in exchange for referring Medicare beneficiaries to IGX for the furnishing and arranging for the furnishing of genetic testing that IGX billed to Medicare.

7.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and their accomplices caused IGX to bill Medicare in violation of the Shell Lab Rule.

8.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and their accomplices agreed to pay kickbacks and bribes to patient recruiters, including **OMAR PALACIOS**, through Tree Medical, and **NADIR PEREZ**, through Ven-Vamos, for referring individuals to IGX for the furnishing and arranging for the furnishing of COVID-19 testing that IGX billed to Medicare.

17

9. **OMAR PALACIOS**, through Tree Medical, entered into a contract with IGX in which IGX agreed to pay **PALACIOS** illegal kickbacks and bribes of approximately $15 for each COVID-19 antigen test and approximately $35 for each COVID-19 PCR test that **PALACIOS** referred to IGX.

10. **NADIR PEREZ**, through Ven Vamos, entered into a contract with IGX where IGX agreed to pay illegal kickback and bribes of approximately $10 for each COVID-19 antigen test and approximately $30 for each COVID-19 PCR test that **PEREZ** referred to IGX.

11. **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ**, Nikita Hermesman, and their accomplices recruited and used health care providers, including physicians, to order repeated COVID-19 PCR tests for beneficiaries, even though the health care providers had no prior relationship with the beneficiaries, were not treating and consulting the beneficiaries for COVID-19 or symptoms of COVID-19, sometimes were ineligible to order the tests altogether, and did not use the test results to treat the beneficiaries.

12. **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ**, Nikita Hermesman, and their accomplices, through IGX, billed, and caused to be billed, to Medicare, claims for reimbursement for COVID-19 testing but the tests, if performed at all, did not have FDA emergency-use authorization and were not reimbursable.

13. **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ**, Nikita Hermesman, and their accomplices, through IGX, billed, and caused to be billed, to Medicare,

COVID-19 testing that was medically unnecessary, never provided, and ineligible for reimbursement.

14.     **ENRIQUE PEREZ-PARIS**, **DIEGO SANUDO SANCHEZ CHOCRON**, **GREGORY CHARLES MILO CASKEY**, **OMAR PALACIOS**, **NADIR PEREZ**, Nikita Hermesman, and their accomplices used the proceeds of the fraud to benefit themselves and others, and to further the fraud.

<u>**Acts in Execution or Attempted Execution**</u>
<u>**of the Scheme and Artifice**</u>

14.     On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, as specified below, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, in that the defendants submitted, and caused the submission of, false and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary, eligible for Medicare reimbursement, and provided to beneficiaries as claimed:

| Count | Defendants | Beneficiary | Approx. Date of Submission | Medicare Claim No. | Description of Claims; Total Approx. Amount Billed |
|---|---|---|---|---|---|
| 2 | PEREZ-PARIS, SANCHEZ, CASKEY, PALACIOS | E.P. | 04/28/2022 | 452922118223050 | Infectious Agent Detection by Nucleic Acid $112.50 |
| 3 | PEREZ-PARIS, SANCHEZ, CASKEY, PALACIOS | E.P. | 05/05/2022 | 452922125165650 | Infectious Agent Detection by Nucleic Acid $112.50 |

| Count | Defendants | Beneficiary | Approx. Date of Submission | Medicare Claim No. | Description of Claims; Total Approx. Amount Billed |
|---|---|---|---|---|---|
| 4 | PEREZ-PARIS, SANCHEZ, CASKEY, PALACIOS | E.P. | 05/05/2022 | 452922125166000 | Infectious Agent Detection by Nucleic Acid $112.50 |
| 5 | PEREZ-PARIS, SANCHEZ, CASKEY, PEREZ | E.A. | 06/16/2022 | 452922167236130 | Infectious Agent Detection by Nucleic Acid $112.50 |
| 6 | PEREZ-PARIS, SANCHEZ, CASKEY, PEREZ | E.A. | 06/16/2022 | 452922167236090 | Infectious Agent Detection by Nucleic Acid $112.50 |
| 7 | PEREZ-PARIS, SANCHEZ, CASKEY, PEREZ | E.A. | 06/16/2022 | 452922167236150 | Infectious Agent Detection by Nucleic Acid $112.50 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 8
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.     The General Allegations section of this Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around November 2019, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON,**
**GREGORY CHARLES MILO CASKEY,**
**OMAR PALACIOS, and**
**NADIR PEREZ,**

20

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate and agree with each other, and others known and unknown to the Grand Jury:

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the HHS in its administration and oversight of Medicare and the HRSA COVID-19 Uninsured Program;

b.      to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and the HRSA COVID-19 Uninsured Program; and

c.      to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, to a person to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and the HRSA COVID-19 Uninsured Program.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and

bribes in exchange for ordering and arranging for the ordering of COVID-19 and genetic testing by IGX, from the Southern District of Florida, and elsewhere, so that IGX could bill Medicare and the HRSA Uninsured Program for COVID-19 and genetic testing; (b) submitting and causing the submission claims to Medicare and the HRSA Uninsured Program through IGX for COVID-19 and genetic testing that were procured through kickbacks and bribes; (c) concealing and causing the concealment of kickback payments; and (d) diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**Manner and Means**

4.      The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

5.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators agreed to pay kickbacks and bribes to patient recruiters, including **OMAR PALACIOS** through Tree Medical, and **NADIR PEREZ** through Ven-Vamos, for referring individuals to IGX for COVID-19 testing that IGX billed to Medicare and the HRSA COVID-19 Uninsured Program and disguised these kickbacks and bribes as payments made pursuant to purported collection services agreements.

6.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, Nikita Hermesman, and other co-conspirators agreed to pay kickbacks and bribes to physicians, including Co-Conspirator 1, for ordering and arranging for the ordering of genetic testing that IGX billed to Medicare and disguised these kickbacks and bribes as payments made to purported management services organizations, including NMI I.

7.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ**, Nikita Hermesman, Co-Conspirator-1, and other co-conspirators caused IGX to submit claims to Medicare and the HRSA COVID-19 Uninsured Program for COVID-19 and genetic testing that were procured through illegal kickbacks and bribes. Medicare and the HRSA COVID-19 Uninsured Program made payments to IGX on these claims.

8.      **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS, NADIR PEREZ**, and Nikita Hermesman used the proceeds of the conspiracy to benefit themselves and others, and to further the conspiracy.

<u>**Overt Acts**</u>

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about January 15, 2021, **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY**, and Nikita Hermesman executed a signature card related to IGX Account 1.

2.      On or about March 15, 2021, **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON**, and **GREGORY CHARLES MILO CASKEY** executed a signature card related to IGX Account 2.

3.      On or about December 7, 2021, **GREGORY CHARLES MILO CASKEY**, through NMI I, wrote a check to Co-Conspirator 1 from the NMI I Account for approximately $10,203 in exchange for ordering and arranging for the ordering of genetic testing referred to IGX.

4.      On or around January 11, 2022, **ENRIQUE PEREZ-PARIS**, **DIEGO SANUDO SANCHEZ CHOCRON**, **GREGORY CHARLES MILO CASKEY**, and Nikita Hermesman paid **OMAR PALACIOS** a kickback and bribe in exchange for referring individuals and doctors' orders for COVID-19 testing to IGX, in the form of a wire for approximately $105,525 from IGX Account 1 to the Tree Medical Account.

5.      On or around March 9, 2022, **ENRIQUE PEREZ-PARIS**, **DIEGO SANUDO SANCHEZ CHOCRON**, **GREGORY CHARLES MILO CASKEY**, and Nikita Hermesman paid **NADIR PEREZ** a kickback and bribe in exchange for referring individuals and doctors' orders for COVID-19 testing to IGX, in the form of a wire for approximately $50,050 from IGX Account 2 to the Ven Vamos Account.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 9-10
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.      The General Allegations section of this Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, as specified below, did knowingly and willfully solicit and receive renumeration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and the HRSA Uninsured Program:

24

| Count | Defendant | Approx. Date of Kickback | Approx. Amt. of Kickback | Description of Kickback |
|---|---|---|---|---|
| 9 | **OMAR PALACIOS** | 1/11/2022 | $105,525 | Wire transfer from IGX Account 1 to the Tree Medical Account |
| 10 | **NADIR PEREZ** | 3/09/2022 | $50,050 | Wire transfer from IGX Account 2 to the Ven Vamos Account |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

**COUNT 11**
**Conspiracy to Commit Money Laundering**
**(18 U.S.C. § 1956(h))**

1.      The General Allegations section of this Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around November 2019, and continuing through in or around June 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON,**
**GREGORY CHARLES MILO CASKEY,**
**OMAR PALACIOS, and**
**NADIR PEREZ,**

did knowingly and voluntarily combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1957(a), that is, to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, knowing that the property involved in such financial transaction represented the proceeds of some form of unlawful activity.

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud,

in violation of Title 18, United States Code, Section 1347; conspiracy to defraud the United States and to pay and receive health care kickbacks, in violation of Title 18, United States Code, Section 371; and receipt of kickbacks in connection with a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

1.     The allegations of this Superseding Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants, **ENRIQUE PEREZ-PARIS, DIEGO SANUDO SANCHEZ CHOCRON, GREGORY CHARLES MILO CASKEY, OMAR PALACIOS**, and **NADIR PEREZ**, have an interest.

2.     Upon conviction of a violation of Title 18, United States Code, Sections 1349, 1347, 371, and/or Title 42, United States Code, Section 1320a-7b(b), as alleged in this Superseding Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.     Upon conviction of conspiracy to commit a violation of Title 18, United States Code, Section 1343, as alleged in this Superseding Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

4.     Upon conviction of a violation of Title 18, United States Code, Section 1956(h), as alleged in this Superseding Indictment, the defendant shall forfeit to the United States any property,

real or personal, involved in such offense, and any property traceable to such property, pursuant to

Title 18, United States Code, Section 982(a)(1).

     5.     The property subject to forfeiture as a result of the alleged offenses includes, but

is not limited to, the following:

     a.  Real property located at 865 Flower Avenue, Los Angeles, CA 90291-2818, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon,

TRACT # 5109 LOT 452, according to the Plat thereof recorded in Plat Book 4234, Page 17, of the Public Records of Los Angeles County, CA.

AIN: 4243017017;

     b.  Real property located at 969 Banyan Beach Drive, Port Aransas, TX 78373, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon,

Banyan Beach NUD LT 4, S0422 – Banyan Beach NUD, M145, according to Plat thereof recorded in Volume 64, pages 29-30, of the public records of Nueces County, TX.

Property Identification Number: 200113990

Geographic Identification Number: 0422-0000-0040; and

     c.  Real property located at 5861 SW 4th Street, Miami, FL 33144, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon,

Lot 19, Block 6, Westlawn Corr Plat PB 9-3, according to Plat thereof recorded in Plat Book 33268, page 4849, of the public records of Miami-Dade County, FL.

Parcel Identification Number: 01-4001-017-0911.

     6.     If any of the property subject to forfeiture, as a result of any act or omission of the

defendant(s):

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Sections 982(a)(1) and (a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL



GRAND JURY FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

REGINALD CUYLER JR.
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**CASE NO.:** 24-20155-CR-RUIZ(s)

v.

ENRIQUE PEREZ-PARIS, et al.,

**CERTIFICATE OF TRIAL ATTORNEY**

_____/
Defendants.

**Superseding Case Information:**
New Defendant(s) (Yes or No) Yes
Number of New Defendants 2
Total number of new counts 6

**Court Division** (select one)
☒ Miami    ☐ Key West    ☐ FTP
☐ FTL      ☐ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take 12 days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I   ☐ 0 to 5 days                   ☐ Petty
   II  ☐ 6 to 10 days                  ☐ Minor
   III ☒ 11 to 20 days                 ☐ Misdemeanor
   IV  ☐ 21 to 60 days                 ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) Yes
   If yes, Judge Ruiz_____ Case No. 24-CR-20155_____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Altonaga_____ Case No. 24-20083-CR_____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

By: _____
REGINALD CUYLER JR.
DOJ Trial Attorney
FL Bar No.        0114062

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** _____**ENRIQUE PEREZ-PARIS**_____

**Case No:** _____**24-20155-CR-Ruiz(s)**_____

Count #:   1

___Title 18, United States Code, Section 1349_____

___Conspiracy to Commit Health Care Fraud and Wire Fraud_____
* **Max. Term of Imprisonment:**    20 years
* **Mandatory Min. Term of Imprisonment (if applicable):**   N/A
* **Max. Supervised Release:**    3 years
* **Max. Fine:**   $250,000 or twice the gross gain or loss from the offense

Counts #:    2 – 7

___Title 18, United States Code, Section 1347_____

___Health Care Fraud_____
* **Max. Term of Imprisonment:**    10 years as to each count
* **Mandatory Min. Term of Imprisonment (if applicable):**    N/A
* **Max. Supervised Release:**    3 years
* **Max. Fine:**    $250,000 or twice the gross gain or loss from the offense

Count #:   8

___Title 18, United States Code, Section 371_____

___Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks___
* **Max. Term of Imprisonment:**    5 years
* **Mandatory Min. Term of Imprisonment (if applicable):**    N/A
* **Max. Supervised Release:**    3 years
* **Max. Fine:**    $250,000 or twice the gross gain or loss from the offense

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

Defendant's Name: _____ **ENRIQUE PEREZ-PARIS** _____

Case No. _____ **24-20155-CR-Ruiz (s)** __ _____

Count #:   11

_____ Title 18, United States Code, Section 1956(h) _____

_____ Conspiracy to Commit Money Laundering _____
* **Max. Term of Imprisonment:** **10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):** **N/A**
* **Max. Supervised Release:** **3 years**
* **Max. Fine:** **$500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**

Defendant's Name:      **DIEGO SANUDO SANCHEZ CHOCRON**

Case No: _____ **24-20155-CR-Ruiz(s)**

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud

* **Max. Term of Imprisonment:      20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 7

  Title 18, United States Code, Section 1347

  Health Care Fraud
* **Max. Term of Imprisonment:      10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   8

  Title 18, United States Code, Section 371

  Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
* **Max. Term of Imprisonment:    5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:    **DIEGO SANUDO SANCHEZ CHOCRON**

Case No.    **24-20155-CR-Ruiz(s)**

Count #:   11

Title 18, United States Code, Section 1956(h)

Conspiracy to Commit Money Laundering
* **Max. Term of Imprisonment:    10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**

Defendant's Name:     **GREGORY CHARLES MILO CASKEY**

Case No:     **24-20155-CR-Ruiz(s)**

Count #:    1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud
* **Max. Term of Imprisonment:**    **20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):**   **N/A**
* **Max. Supervised Release:**   **3 years**
* **Max. Fine:**   **$250,000 or twice the gross gain or loss from the offense**

Counts #:    2 – 7

  Title 18, United States Code, Section 1347

  Health Care Fraud
* **Max. Term of Imprisonment:**    **10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):**    **N/A**
* **Max. Supervised Release:**   **3 years**
* **Max. Fine:**    **$250,000 or twice the gross gain or loss from the offense**

Count #:    8

  Title 18, United States Code, Section 371

  Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
* **Max. Term of Imprisonment:**    **5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):**    **N/A**
* **Max. Supervised Release:**   **3 years**
* **Max. Fine:**    **$250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**   **GREGORY CHARLES MILO CASKEY**

**Case No:**   **24-20155-CR-Ruiz(s)**

Count #:   11

Title 18, United States Code, Section 1956(h)

Conspiracy to Commit Money Laundering
* **Max. Term of Imprisonment:    10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**          **OMAR PALACIOS**

**Case No:**                    **24-20155-CR-Ruiz(s)**

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud
* **Max. Term of Imprisonment:     20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

  Title 18, United States Code, Section 1347

  Health Care Fraud
* **Max. Term of Imprisonment:    10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   8

  Title 18, United States Code, Section 371

  Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
* **Max. Term of Imprisonment:    5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   **OMAR PALACIOS**

**Case No:**   **24-20155-CR-Ruiz(s)**

Counts #:   9

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

Receipt of Kickbacks in Connection with a Federal Health Care Program
* **Max. Term of Imprisonment:    10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   11

Title 18, United States Code, Section 1956(h)

Conspiracy to Commit Money Laundering
* **Max. Term of Imprisonment:    10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** _____**NADIR PEREZ**_____

**Case No:** _____**24-20155-CR-Ruiz(s)**_____

Count #:   1

   Title 18, United States Code, Section 1349

   Conspiracy to Commit Health Care Fraud and Wire Fraud
* **Max. Term of Imprisonment:    20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

Counts #:   5 – 7

   Title 18, United States Code, Section 1347

   Health Care Fraud
* **Max. Term of Imprisonment:    10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   8

   Title 18, United States Code, Section 371

   Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
* **Max. Term of Imprisonment:    5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**      **NADIR PEREZ**

**Case No:**      **24-20155-CR-Ruiz(s)**

Counts #:    10

    Title 42, United States Code, Section 1320a-7b(b)(1)(A)

    Receipt of Kickbacks in Connection with a Federal Health Care Program
* **Max. Term of Imprisonment:**    **10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):**    **N/A**
* **Max. Supervised Release:**    **3 years**
* **Max. Fine:**    **$250,000 or twice the gross gain or loss from the offense**

Count #:    11

    Title 18, United States Code, Section 1956(h)

    Conspiracy to Commit Money Laundering
* **Max. Term of Imprisonment:**    **10 years**
* **Mandatory Min. Term of Imprisonment (if applicable):**    **N/A**
* **Max. Supervised Release:**    **3 years**
* **Max. Fine:**    **$500,000 or twice the value of the property involved in the transaction**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**