**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 24-CR-20155-RAR**

**UNITED STATES OF AMERICA**

**vs.**

**ENRIQUE PEREZ-PARIS,**
**DIEGO SANUDO SANCHEZ CHOCRON,**
**GREGORY CHARLES MILO CASKEY,**
**OMAR PALACIOS, and**
**NADIR PEREZ,**

        **Defendants.**

_____/

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE**
**INEXTRICABLY INTERTWINED EVIDENCE**
**OR EVIDENCE PURSUANT TO FED. R. EVID. 404(b)**

Pursuant to Federal Rule of Evidence 404(b)(2)-(3) and Local Rule 88.10(h), the United States of America, through undersigned counsel hereby informs Defendants of its intent to introduce evidence at trial of the following:

A. Innovative Genomics, LLC ("IGX") employed the same scheme and people to generate orders for laboratory testing as Defendants Perez-Paris, Caskey, Palacios and Co-Conspirator Hermesman did for other laboratories.

B. IGX's Owners (Perez-Paris, Sanchez, Caskey, and Hermesman) billed for medically unnecessary respiratory pathogen panel tests ("RPP tests") as add-ons to COVID-19 tests.

C. IGX's Owners used Medicare beneficiaries' personal identifying information obtained from prior claims IGX billed to target them in telemarketing campaigns for over-the-counter COVID-19 tests that they did not want or need.

D.  Other crimes Defendants engaged in to carry out the scheme and generate proceeds from the scheme.

E.  Probes and audits of IGX by Government and private entities.

Much of the evidence is either direct evidence of the charged conduct or is inextricably intertwined with the charges.  However, in an abundance of caution and in the interest of full disclosure, the Government notices this evidence under Rule 404(b)(2) to prove knowledge, intent, motive, and absence of mistake.

## BACKGROUND

On June 24, 2024, a grand jury in the Southern District of Florida returned an 11-Count Superseding Indictment in this matter charging Defendants with health care fraud, wire fraud, kickback, and money laundering offenses for their respective roles in an approximately $65 million scheme to bill Government and private payors for medically unnecessary and non-reimbursable COVID-19 and genetic tests.  Defendants Perez-Paris, Sanchez, Caskey, and Co-Conspirator Hermesman owned IGX ("IGX's Owners").  Defendant Palacios was among IGX's most productive patient recruiters.

The scheme at IGX was plain: pay patient recruiters to generate falsified orders for laboratory tests.  The patient recruiters bribed providers for these orders and even forged orders or had subordinates do it for them.  The Superseding Indictment focuses on COVID-19 and genetic testing, IGX's highest grossing tests.  The evidence will show that IGX's Owners selected which types of tests and payors to target as well as the diagnosis and procedure codes that needed to be in the orders so they would be reimbursed.  They then directed the patient recruiters to obtain orders pursuant to those codes regardless of whether they were medically necessary or reimbursable.  For example, because patient recruiters were bribing them, providers referred orders

for genetic testing to IGX that patients did not need and for tests that IGX did not have the ability to perform.

The alleged conspiracy began with generating orders for genetic testing and evolved into COVID-19 testing, which quickly became the most lucrative for IGX.   Defendants Perez-Paris, Caskey, and Palacios served as patient recruiters with Co-Conspirator Hermesman for other laboratories in a prior genetic testing scheme.  Some of those laboratories' owners and operators were criminally charged in September 2019 in a large enforcement action called Operation Double Helix.  Once those laboratories shut down, Perez-Paris, Sanchez, Caskey, and Hermesman opened IGX and effectively restarted the scheme – first with genetic testing and then, when the pandemic began, with COVID-19 testing.  The scheme continued to involve kickbacks to patient recruiters to generate orders for laboratory testing regardless of medical necessity or other requirements for reimbursement.  Defendant Palacios was brought on as a proven patient recruiter.

Specifically, the Government will present evidence at trial showing that IGX's Owners entered into illegal volume-based agreements with patient recruiters, including Defendant Palacios, to set up COVID-19 testing tents around the country to collect samples.  COVID-19 polymerase chain reaction ("PCR") tests require a physician's order, had to be sent to a laboratory, could take up to three days to generate results, and are more likely to detect the virus.  COVID-19 antigen tests provide results in 15-30 minutes at the point of care.  IGX gave the patient recruiters direct access to its laboratory information system ("LIMS") to create their own physicians' orders for COVID-19 PCR tests.  Pay was directly tied to how many orders the patient recruiters created on their own.  The ordering providers were not at the testing sites and made no determination as to the tests' medical necessity.  However, their signatures were pre-populated on the requisition forms for the test.  Because patient recruiters were paid for creating their own orders, this resulted

in billing for tests that were never administered at all, billing for patients that were dead, and patients being subject to repeated testing with no medical oversight or no need for them, all under the guise that a physician had ordered the tests.

IGX's Owners and the patient recruiters also made material misrepresentations regarding IGX's COVID-19 PCR testing to entice patients to take these tests and so that payors would reimburse for them – particularly, that IGX administered tests that had U.S. Food & Drug Administration emergency-use authorization ("FDA EUA") and that IGX could provide 24-hour COVID-19 PCR test results from anywhere in the country despite the tests having to be shipped to the laboratory in San Antonio, Texas.  IGX's Owners knew these false representations were being made.

From in or around November 2019 to in or around June 2023, as a result of the scheme, IGX billed payors approximately $65,875,979, of which roughly $44,417,197 was paid. Defendants are currently set to begin trial on March 3, 2025.

## THE PROPOSED EVIDENCE

### A. IGX employed the same scheme and people to generate orders for laboratory testing as Defendants Perez-Paris, Caskey, Palacios, and Co-Conspirator Hermesman did for other laboratories in a prior scheme.

The Government will seek to introduce evidence demonstrating that Co-Conspirator Nikita Hermesman previously paid Defendants Perez-Paris, Caskey, and Palacios, Co-Conspirator Daryle Fallings, and others as his downline patient recruiters on volume-based agreements he had with laboratory owners charged in Operation Double Helix, including Khalid Satary and Ravitej Reddy.[1]  Hermesman paid them through shell companies, one of which he owned with his ex-

---

[1]    Daryle Fallings and Ravitej Reddy have also been convicted.  *See* [ECF No. 42] *United States v. Fallings*, No. 22-cr-00154 (C.D. Cal. Marc. 28, 2023); [ECF No. 78], *United States v. Reddy*, No. 19-cr-00357 (W.D. Pa.).

fiancé who was convicted of conspiracy to commit health care fraud.  *See* [ECF No. 206] *United States v. Curran*, No. 18-CR-80124-RUIZ (S.D. Fla. Feb. 20, 2020) (IGX_SD_000082359).

Roughly two months after Operation Double Helix was announced, Defendants Perez-Paris, Sanchez, Caskey, and Co-Conspirator Hermesman officially launched IGX.  They immediately started using some of the *same* providers that Perez-Paris, Caskey, Hermesman, and others bribed for the previous laboratories to refer the *same* types of tests to IGX.  They also continued referring orders to other laboratories the same way.  Defendant Sanchez agreed to join as he was Perez-Paris' childhood friend and was interested in instantly generating profit from the built-in referrals.  Perez-Paris, Caskey, and Hermesman brought in Sanchez as IGX's Chief Financial Officer because of his experience in finance and investing in cryptocurrency arbitrages, as they wanted to invest the laboratory's revenue in cryptocurrency.  Indeed, despite being geographically dispersed (Sanchez in Los Angeles, Perez-Paris and Hermesman in Miami, and Caskey in San Antonio), they chose to open IGX in San Antonio, Texas.  This is because, through Perez-Paris, Caskey, and Hermesman's experience recruiting at other laboratories, they believed that the Medicare Administrative Contractor that covered Texas for laboratory testing was the easiest to target for fraud, and Caskey already had a stable of doctors there that he was bribing for referrals.  They then enlisted several other patient recruiters that Perez-Paris, Caskey, and Hermesman worked with at the previous laboratories to join IGX, including Palacios, and Fallings. They continued to build out IGX's patient recruiter ranks with others, including Defendant Perez. The evidence to be introduced will be potential testimony from Hermesman, Reddy, and Fallings and documents including the following:[2]

---

[2]     These witnesses and documents have been disclosed to Defendants in discovery and the Government's Preliminary Witness and Exhibit Lists

- Co-Conspirator Hermesman's contracts with Satary listing the amounts to be paid per laboratory test he referred to Satary's laboratories.

- The invoices that Hermesman, Palacios, Perez-Paris, and Fallings sent to Satary's laboratories that were used as templates for invoices IGX used.

- The "new account" enrollment forms Caskey, Hermesman, and Perez-Paris used to enroll some of the physicians with the previous laboratories.

- Banking records reflecting payments from Hermesman to Caskey, Palacios, Fallings, and others for patient referrals sent to laboratories.

- Documents and communications showing that Defendants knew others were arrested and convicted for the same conduct in which Defendants were engaging.

- Documents showing that Perez-Paris converted the human resources software and website of the company he used to receive his share of the payments from the previous laboratories into IGX.

**B. IGX's Owners, through IGX, billed for false and fraudulent orders for respiratory pathogen panels as add-ons to COVID-19 tests.**

The Government will seek to introduce evidence that Defendants Perez-Paris, Sanchez, Caskey, and Co-Conspirator Hermesman, through IGX, billed health care benefit programs for medically unnecessary respiratory pathogen panels that were automatically added onto COVID-19 tests from the same swab.  This evidence will consist of billing data reflecting IGX's submissions of RPP tests, testimony from Co-Conspirator Hermesman, and communications among Perez-Paris, Sanchez, Caskey, and Co-Conspirator Hermesman discussing the decision to do so and knowledge that it was illegal.  This evidence has also been included on the Government's Preliminary Exhibit List.

**C. IGX's Owners used Medicare beneficiaries' personal identifying information obtained from prior claims IGX billed to target them in telemarketing campaigns for over-the-counter COVID-19 tests that they did not want or need.**

The Government will seek to introduce evidence that Defendants Perez-Paris, Sanchez, Caskey, and Co-Conspirator Hermesman, through IGX, used Medicare beneficiaries' information previously received for other tests to target them in telemarketing campaigns for over-the-counter ("OTC") COVID-19 tests.  IGX sent these tests to beneficiaries regardless of if they wanted or needed them so that IGX could bill Medicare.  This evidence will consist of testimony from Hermesman and communications showing knowledge of complaints regarding the tests, also on the Government's Preliminary Exhibit List.

**D. Other crimes Defendants engaged in to carry out the scheme and generate proceeds from the scheme.**

The Government will seek to introduce evidence that Defendants committed a host of other serious crimes in furtherance of the scheme.  IGX's Owners conspired to distribute the COVID-19 PCR tests, *in vitro* diagnostic medical devices, that they knew were not authorized or approved by the FDA.  *See* 21 U.S.C. §§ 331 and 333; *see* [ECF No. 46 at 18].  They also conspired to commit bank fraud in obtaining loans to finance IGX by misrepresenting that they were following applicable laws and regulations while they knew that they were committing fraud and using the proceeds to repay the loans.  *See* 18 U.S.C. § 1344.  Defendants Perez-Paris, Sanchez, Caskey, and Co-Conspirator Hermesman were signatories on these loans.  Additionally, Defendants conspired to engage and engaged in aggravated identity theft by using patients' and medical professionals' information without their consent and to obtain proceeds from the scheme.  *See* 18 U.S.C. § 1028A; *see* [ECF No. 46 at 17-18].  IGX's volume-based contracts applied to claims reimbursed by private payors as well which is also a violation of the Eliminating Kickbacks in Recovery Act ("EKRA"),

*see* 18 U.S.C. § 220.   IGX's owners instructed the patient recruiters to apply the same scheme to whatever payor was presented to them.   *See* [ECF No. 46 at 18].   The direct evidence in this case also establishes these offenses.   They simply have not been charged at this time.

**E.  Probes and audits of IGX by Government and private entities.**

The Government will seek to introduce evidence of probes and audits of IGX conducted by entities such as Medicare, the FDA, and private payors during and after the time frame alleged in the Superseding Indictment.  Some audits began after the conspiracy ended but for claims billed during the conspiracy.   All of these audits are intrinsic evidence to the charged conduct. Nonetheless, in an abundance of caution, notice is hereby provided that the Government intends to introduce testimony from the payors and Co-Conspirator Hermesman, and documents related thereto.

## LEGAL STANDARD

Evidence of prior bad acts is not extrinsic under Rule 404(b) if it: (1) arose out of the same transaction as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably linked with the charged offense.  *United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008) (affirming mail fraud conviction).  It is settled law that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."  *United States v. McClean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)); *see also United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (holding that "evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an 'integral and natural part of the

witness's accounts of the circumstances surrounding the offenses to which the defendant was indicted.'") (quoting *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989)).

In contrast, Rule 404(b)(2) permits the introduction of evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Courts in this Circuit apply a three-prong test to assess the admissibility of extrinsic evidence under Rule 404(b):

> First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

*United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (upholding district court's admission of evidence of defendant's prior crimes).[3] "A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998) ("The relevance of other crimes evidence to intent is determined by comparing the defendant's state of mind in committing both the extrinsic and charged offenses.").[4]

---

[3] As with any evidence, "the probative value of proffered 404(b) evidence must not be *substantially outweighed* by unfair prejudice." *Jernigan*, 341 F.3d at 1282 (internal quotations omitted). "This determination lies within the sound discretion of the district judge and calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Id.*

[4] The Eleventh Circuit has recognized that Rule 404(b) is "a rule of inclusion, and . . . accordingly '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'" *Id.* (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1562 (11th Cir. 1994)) (*accord United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004)).

## ARGUMENT

I.   **MUCH OF THE PROPOSED EVIDENCE INVOLVES ACTS IN FURTHERANCE OF THE CHARGED CONSPIRACY OR IS INEXTRICABLY INTERTWINED WITH THE CHARGES.**

The proposed evidence directly inculpates Defendants in the charged scheme to pay and receive bribes for obtaining falsified orders for laboratory tests.  In *United States v. Nerey*, the Eleventh Circuit agreed with the district court in admitting "[e]vidence of Nerey's involvement with other home health care agencies . . . was inextricably intertwined with, and probative of, how Nerey became involved with the home health care agencies in this case and why they trusted him as a patient recruiter."  877 F.3d 956, 975 (11th Cir. 2017).  Similarly, in *United States v. Benevides*, the Eleventh Circuit found no error in the district court admitting testimony of the defendant's "participation in a scheme involving the same manner of fraud (submitting false Medicare claims), using the same type of company . . . , hiring the same intermediaries to bill the claims and launder the money (All-Med and Cashflow), and involving the same main players (Guerra and Benevides)."  470 F. App'x 782, 788 (11th Cir. 2012).  Likewise, in *United States v. Ruiz*, 698 F. App'x 978 (11th Cir. 2017), the Eleventh Circuit agreed that evidence of kickback transactions was admissible in a case where defendant was charged with health care fraud, but not kickbacks.  The defendant was charged with "fabricating and falsifying medical records to reflect treatment services which were not provided."  *Id.*, 698 F. App'x at 989.  Evidence that the defendant admitted patients to the treatment facility "so that she would receive a kickback [was] 'inextricably intertwined' with the charged health care fraud conspiracy."

Rule 404(b) is a rule "of inclusion which allows [extrinsic] evidence unless it tends to only prove criminal propensity.  The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite."  *Stephens*, 365 F.3d at 975 (quoting *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989) (internal quotations omitted)).

Here, evidence that the charged scheme evolved out of a prior laboratory fraud scheme involving many of the Defendants is inextricably intertwined with the charged conduct. The Defendants created IGX in response to the arrest and dismantling of a prior laboratory scheme, used many of the same conspirators, and operated in the same manner. They used similar volume-based contracts to generate revenue and, in some instances, the same sham invoices to disguise the kickbacks. This evidence tells the story, motive, and set-up of the crime, and is an "integral and natural part" of the genesis of IGX. *See McClean*, 138 F.3d at 1403; *Edouard*, 485 F.3d at 1344; [ECF No. 141], *United States v. Perez-Paris et al.*, No. 24-cr-20155 (S.D. Fla. Dec. 20, 2024) (paperless order denying Defendant Sanchez's motion to sever citing *McClean*). Specifically, it explains how and why a geographically dispersed group joined to form and operate IGX from South Florida. Perez-Paris, Caskey, Hermesman, Palacios, and others knew who to bribe so that IGX could generate revenue immediately. Sanchez had experience in accounting and cryptocurrency arbitrages – one of the manners in which they intended to launder IGX's proceeds. They chose to open IGX in San Antonio, Texas because, through Perez-Paris, Caskey, and Hermesman's experience recruiting at other laboratories, they knew that the Medicare Administrative Contractor that covered Texas for laboratory testing was a ripe target for fraud. Particularly, it reimbursed for expensive "Tier 2" codes that other jurisdictions did not. These codes were frequent targets for fraud as they were the most expensive but pertained to testing rare genes that applied to an extremely small fraction of the population. From there, they simply built the patient recruiter ranks at IGX with people they knew like Defendant Palacios, and anyone else who wanted to make money even if they had no medical background. Thus "[e]vidence of [Defendants'] involvement with other [laboratories] . . . [is] inextricably intertwined with, and probative of, how [they] became involved with . . . [IGX] . . . and why they trusted [each other] as

a patient recruiter[s]." *Nerey*, 877 F.3d at 975.  This resulted in the "same manner of fraud . . . using the same type of company [a laboratory] . . . [and] hiring the same intermediaries to bill claims . . . ." *Benevides*, 470 F. App'x at 788.

Evidence of uncharged crimes Defendants committed in furtherance of the charged scheme are also admissible as inextricably intertwined.  *See* Ruiz, 698 F. App'x at 989 (Evidence that the defendant admitted patients to the treatment facility "so that she would receive a kickback [was] 'inextricably intertwined' with the charged health care fraud conspiracy.").  As noted above, IGX's Owners knew that they were administering COVID-19 PCR tests that were not FDA authorized. *See* 21 U.S.C. §§ 331 and 333.  These tests were significantly cheaper than those that were FDA authorized and thus IGX's Owners increased their profit margins by misrepresenting what was administered.  IGX's Owners also knew that they misrepresented to financial institutions, including Bank 1, that they were following applicable laws and regulations in running IGX so that they could obtain funds to finance the scheme.  *See* 18 U.S.C. §1344.  Defendants also knew that patients' identities were being stolen to bill because of the frequent complaints.  *See* 18 U.S.C. § 1028A.  Using the patients' information to bill directly supported the underlying scheme to generate falsified orders for laboratory tests.  *See Dubin v. United States*, 599 U.S. 110, 114 (2023). Also, for the volume-based contracts for the COVID-19 tests, the patient recruiters were paid kickbacks for antigen and PCR tests regardless of the payor, and they were instructed to collect whatever insurance information they received.  Kickbacks paid for reimbursements of referrals made to private payors violate 18 U.S.C. § 220.  IGX's Owners also knew that billing for RPP panels from the same swabs collected for COVID-19 was illegal as they subscribed to publications informing them of this, but they did it anyway to increase their profits.  They also used the same

information collected from Medicare beneficiaries to target them for COVID-19 tests they did not request or need as they received complaints stating this.

Evidence stemming from payors' audits that put IGX's Owners on notice of the lack of medical necessity of its tests and indicia of overutilization is evidence of their knowledge that their business model was illegal. *See United States v. Bek*, 493 F.3d 790 (7th Cir. 2007) (affirming health care fraud conviction supported by evidence that a pharmacy benefit company sent defendant a letter informing him that company had paid to fill some of the prescriptions he had issued and that "there is potential over-utilization for controlled substances."). IGX's Owners participated in these audits. For example, Medicare audited IGX's genetic testing claims and the patient files supporting the claims and communicated to them that the tests lacked medical necessity and that they were violating the Shell Laboratory Rule. Physicians that Defendant Caskey was paying for the referrals ordered the tests. Private payors conducted investigations and made law enforcement referrals regarding IGX's billing practices. Particularly, that IGX's billing patterns indicated overutilization and fraud. The FDA also suspected IGX of offering non-FDA authorized COVID-19 tests, and directly contacted IGX about it. These audits contained information about regulations relevant to the tests at issue in this case. They are, as such, intrinsically intertwined with the charged offenses. They also demonstrate knowledge of the pertinent laws and that IGX's Owners were not following them. *United States v. Stokes*, 392 F. App'x 362 (6th Cir. 2010) (holding that evidence of corporate audits performed on defendant's medical practice was offered to show that defendant had knowledge of auditors' warnings and guidance). The probe and audits also provided IGX's Owners with information regarding the types of records they needed to have ready to try to justify their fraudulent claims.

## II.    THE PROPOSED EVIDENCE IS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE RULE 404(B).

Alternatively, the same evidence is admissible under Rule 404(b) to prove Defendants' knowledge, intent, motive, and absence of mistake.  Defendants used some of the *same* people to bribe the *same* physicians to order the *same* types of tests using the *same* method of pay and invoices right after the Double Helix enforcement action.  This speaks volumes about their culpable mental state.  *See United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) ("A similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense"); *United States v. Hernandez*, 896 F.2d 513, 521 (11th Cir. 1990) (indicating that when evaluating the probative value of an extrinsic offense to establish intent, a court must "consider the similarity between the extrinsic and charged offenses and the time gap between the two offenses").  Moreover, evidence of the additional uncharged crimes leading up to and during the conspiracy is relevant to Defendants' intent because of the overlap in involvement and because the overarching objective was the same.  *See United States v. Graham*, 51 F.4th 67, 82 (2d Cir. 2022) (holding that the district did not err in admitting evidence of uncharged crimes committing "at the same time as the charged conspiracy, with the same coconspirators, and with the same hallmarks—"unconventional" . . . techniques used to purportedly discharge debt[,]" was probative of fraudulent intent); *United States v. Kolodesh*, 787 F.3d 224, 236 (3d Cir. 2015) (affirming admission of evidence of uncharged fraudulent activity occurring at a home health company where "it was offered as circumstantial evidence of [the defendant's] knowledge of the fraudulent activity. . .[,]" undermining defendant's theory that  he "ran Community Home Health as a legal, legitimate business.").  Additionally, the audits conducted on IGX, of which Perez-Paris, Sanchez, and Caskey were aware, are plain evidence of

14

the knowledge that what they were doing was wrong.  Fed. R. Evid. 404(b).  This is not character evidence, and its relevance is not substantially outweighed by any prejudice because it bears directly on intent.

The Government expects Defendants to dispute their knowledge and intent by (i) shifting blame on others, including third parties and subordinates; (ii) arguing that certain regulations were in flux during the pandemic; and (iii) arguing that they believed patients needed the tests.  The proposed evidence described above contradicts these defenses.

## CONCLUSION

The Government respectfully submits that the above-described evidence is properly admitted as intrinsic or inextricably intertwined with the charged conduct and proof of knowledge, intent, motive, and absence of mistake under Rule 404(b)(2).  The evidence is not submitted to prove Defendants' character and any prejudice is far outweighed by its relevance.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By:      /s/ *Reginald Cuyler Jr.*
James V. Hayes
Florida Special Bar No. A5501717
Assistant Chief
Reginald Cuyler Jr.
Florida Bar No. 0114062
Matthew R. Belz
Florida Special Bar No. A5503303
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW

15

Washington, D.C. 20005
Tel: (202) 774-4276 (Hayes)
Tel: (202) 748-3024 (Cuyler)
Tel: (202) 579-4526 (Belz)
james.hayes@usdoj.gov
reginald.cuyler.jr@usdoj.gov
matthew.belz@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2025, I served and filed the forgoing document with

the Clerk of the Court via ECF.

By:      /s/ *Reginald Cuyler Jr.*
         Reginald Cuyler Jr.
         Trial Attorney