UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-CR-20155-RAR

UNITED STATES OF AMERICA

vs.

DIEGO SANUDO SANCHEZ CHOCRON, and
GREGORY CHARLES MILO CASKEY,

      **Defendants.**
_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO STRIKE ALLEGATIONS FROM COUNT 1

The United States, through undersigned counsel, hereby files this response in opposition to Defendants' Motion to Strike Allegations in Count 1 that Were Dismissed in Count 8 and to Prohibit Arguments Related to the Dismissed Counts [D.E. 333 (the "Motion")]. The Defendants are charged in Count 1 with conspiring to commit health care fraud and wire fraud. The manner and means section of Count 1 alleges that the fraud was carried out through, among other things, kickbacks paid to doctors to refer orders for genetic testing and to patient recruiters for genetic and COVID-19 testing. [*See* D.E. 46, Superseding Indictment, Count 1, ¶¶ 5, 6, 8-10]. The Government should be permitted to reference money paid to doctors and patient recruiters, as alleged, as part of the health care fraud.

First, the Court's ruling on Count 8 does not warrant revisions to the allegations in Count 1. Each count in the Superseding Indictment stands on its own. Count 1 does not require that the jury find a knowing and willful violation of the Anti-Kickback Statute, as Count 8 would have required. Instead, Count 1 "requires proof of a fact that" Count 8 does not: that the defendants conspired to submit fraudulent claims. *See Blockburger v. United States*, 284 U.S. 299 (1932).

1

Second, the Government has proven that Milo Caskey paid doctors who were referring genetic tests to IGX through his MSOs, and that Sanchez knew this, and further that IGX paid patient recruiters to generate COVID-19 referrals. The Government is not seeking to relitigate the Court's prior ruling on Count 8. But even if the Government has not proven a knowing and willful violation of the Anti-Kickback Statute, it should be able to reference the evidence that has been elicited regarding payments to doctors, payments to patient recruiters, and each Defendant's knowledge of or involvement in those payments as evidence of each Defendant's knowledge and intent with respect to the submission of false and fraudulent claims, as alleged in Count 1. While kickbacks are not tantamount to fraud, payments to doctors and patient recruiters are relevant to establish fraud counts, and such payments are one way that fraudulent claims are procured. *See United States v. Medina*, 485 F.3d 1291, 198-99 (11th Cir. 2007)(defendant convicted of kickback conspiracy but such evidence could also be used to prove health care fraud); *see also United States v. Grow*, 977 F.3d 1310, 1326-28 (11th Cir. 2020) (affirming defendant's health care fraud conviction in case where defendant bribed recruiters for medically unnecessary referrals; defendant also convicted of kickbacks charges).[1]

---

[1] While the Government has not found any case directly on point, nor has the Defendant, and the Second Circuit addressed a similar issue in a racketeering prosecution, *United States v. Zemlyansky*, in which the defendant was acquitted of certain crimes and argued that he could not be convicted of racketeering using those crimes as a predicate. 908 F.3d 1 (2d Cir. 2018). The *Zemlyansky* court held that the defendant could still be convicted of racketeering based on his involvement in a scheme that contemplated others committing those crimes. *Id*. at 10. In the same way, the Government should be entitled to argue at trial that the claims Caskey and Sanchez conspired to submit to Medicare for genetic testing were fraudulent and medically unnecessary because they were tainted by kickbacks. Similarly, the Eleventh Circuit has held that because the predicate acts in a RICO conspiracy count mirror crimes charged in the indictment, unlike the substantive RICO count, "the acquitted counts do not necessitate the finding that the issue of ultimate fact, i.e., agreement to commit two or more predicate acts or agreement to the overall objective of the enterprise, was necessarily determined. This is because the actual commission of the underlying crime does not constitute 'an essential element" of RICO conspiracy.'" *United States v. Shenberg*, 89 F.3d 1461, 1479 (11th Cir. 1996)(quoting *United States v. Eley,* 968 F.2d

2

For example, the Government presented financial records including checks from Caskey's companies to multiple doctors who, in sum, referred approximately $4 million in genetic testing that IGX billed to Medicare. *See* GX 28-30 (checks); GX 113 (summary slide showing IGX's billing to Medicare for Caskey's doctors' referrals). Caskey also received a legal opinion before the scheme in Count 1 that stated flatly and unequivocally that Caskey's plan to enter corporate arrangements wherein physicians are compensated "up to 40%" of the company's revenue was lawful only if the "laboratories do not provide any services which are reimbursed by Medicare … or any other government program." GX 1319 at 2. And here, the genetic testing was billed virtually exclusively to Medicare. *See* GX 100. The legal opinion went on to explain that "[t]he best way to make sure you do not violate federal law, is to never process federal payor claims which are generated under these facts." *Id.* at 6. But Caskey did just that, and Sanchez knew it.

In addition, Enrique Perez-Paris testified that Caskey had "MSOs, the managed service organizations," which were "basically a way to induce referrals, to pay doctors and get them to send test orders to us." Tr. 3/17/25 at 76:9-15. Perez-Paris further testified that "we got [orders] from the doctors that Milo was paying," and specifically identified four doctors from GX 113 as from Milo Caskey and his business partnerships." *Id.* at 75:19-76:7. Perez-Paris also testified that Sanchez was aware that Caskey would bring in the doctors and that Sanchez left Perez-Paris an audio message stating that "it was great that Milo said he was going to bring the clean doctors first and, if need be, we could trash it up later with the MSO doctors." *Id.* at 206:17-24. And a recording

---

1143, 1146 (11th Cir.1992)). The Government is therefore not barred from using "predicate acts that mirror acquitted substantive offenses" to prove the charged RICO conspiracy. *Shenberg*, 989 F.3d at 1481.

.

was introduced in which Diego Sanchez commented on Caskey's doctors that he was paying as (depending on the translation) as "garbage," "trash," or "dirty." GX 813.

The Government has submitted enough evidence at trial before this jury to argue that one way in which Caskey and Sanchez knew they were committing the fraud alleged in Count 1 is that Caskey was paying doctors in this manner whom he and Sanchez knew were referring Medicare claims for which IGX billed. The payment to these doctors explained why they may have been willing to order medically unnecessary tests. Even a witness called by Caskey, Nurse Practitioner Torres, stated she could see how paying doctors could lead to medically unnecessary referrals as charged in Count 1. In other words, one way in which Caskey and Sanchez knew the genetic tests were medically unnecessary is because the doctors referred those tests at Caskey's request because they were getting paid. Likewise, Caskey and Sanchez knew that they could get the doctors to revise requisition forms because they were being paid to do so, and they commanded such doctors to follow the "Nikita Method" or "Nikita Protocol." *See* GXs 1322, 1345-46.

The Government has proven that the genetic tests in this case were largely medically unnecessary. Caskey's payments to the doctors who referred these tests reflect his knowledge of that fraud, and Sanchez's, because Sanchez also knew that these doctors were paid by Caskey because Caskey and Enrique Perez-Paris both told him this. Similarly, even if Sanchez did not conspire to violate the Anti-Kickback Statute, he knew that Caskey had relationships with doctors and, when asked what Perez-Paris told Sanchez about Milo Caskey when the business was starting out, Perez-Paris responded that "I said, look, Milo has MSOs, which meant paying them, and has a lot of doctor relationships." Tr. 3/17/25 at 61:13-20. Accordingly, the allegations and evidence about Caskey paying doctors, and about IGX through Sanchez and others paying marketers like Omar Palacios and Nadir Perez – as reflected in their volume-based invoices to IGX (GXs 604

4

and 605) and their kickback ledgers (GXs 318 and 319) – is relevant and permissible evidence to prove the health care fraud and wire fraud conspiracy alleged by the Government. The fact that Defendants were acquitted of a separate kickback conspiracy count is immaterial; they have been on notice since the Superseding Indictment was returned of the allegations in it.

## CONCLUSION

The Government respectfully requests that the Court deny Defendants' Motion.

Dated: March 24, 2025

Respectfully submitted,

LORINDA LOREYA, ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By: /s/ *James V. Hayes*
James V. Hayes, Assistant Chief
Florida Special Bar No. A5501717
Reginald Cuyler Jr.
Florida Bar No. 0114062
Matthew R. Belz
Florida Special Bar No. A5503303
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, D.C. 20005
(202)-774-4276 (Hayes)
james.hayes@usdoj.gov
reginald.cuyler.jr@usdoj.gov
matthew.belz@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on March 24, 2025, I served and filed the forgoing document with the Clerk of the Court via ECF.

By: /s/ *James V. Hayes*